UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
TASHIA L. POPE,

                            Plaintiff,

              -against-

KILOLO KIJAKAZI, ACTING COMMISSIONER
OF SOCIAL SECURITY,

                           Defendant.
------------------------------------------------------------X

**OPINION AND ORDER**

22 Civ. 00274 (JCM)

Plaintiff Tashia L. Pope ("Plaintiff") commenced this action on January 11, 2022 pursuant to 42 U.S.C. § 405(g), challenging the decision of the Commissioner of Social Security (the "Commissioner"), which found Plaintiff not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. (Docket No. 1).[1]  Presently before the Court are: (1) Plaintiff's "motion for summary judgment on the pleadings" pursuant to Rule 56(a)[2] of the Federal Rules of Civil Procedure, (Dkt. No. 15), accompanied by a memorandum of law, (Dkt. No. 16) ("Pl. Br."); and (2) the Commissioner's cross-motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, (Dkt. No. 18), accompanied by a memorandum of law, (Dkt. No. 19) ("Comm'r Br.").  For the reasons set forth herein, Plaintiff's motion is denied, and the Commissioner's cross-motion is granted.

---

[1] This action is before the undersigned for all purposes on consent of the parties, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Docket No. 10).

[2] Plaintiff refers to her motion as one seeking summary judgment pursuant to Fed. R. Civ. P. 56(a).  However, it appears to be a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  Regardless, "[g]iven the nature of the proceedings — an action to review a final decision of the Commissioner — it makes no difference" whether Plaintiff's motion is considered "to be a motion for judgment on the pleadings or a motion for summary judgment." *Monroe v. Berryhill*, 17 Civ. 3373 (ER) (HBP), 2018 WL 3912255, at *1 n.2 (S.D.N.Y. July 24, 2018).

## I.  BACKGROUND

Plaintiff was born on May 2, 1983. (R.[3] 289).  Plaintiff applied for DIB and SSI on September 30, 2016, alleging a disability onset date of April 1, 2015. (R. 162).  On January 12, 2017, Plaintiff's claim was initially denied. (R. 146-47).  Plaintiff then requested an administrative hearing to review the denial of her claims. (R. 188).  On October 9, 2018, Administrative Law Judge ("ALJ") Sharda Singh held a hearing. (R. 52-95).  ALJ Singh issued a written decision on January 9, 2019, finding that Plaintiff was not disabled from April 1, 2015 through the decision date, and was thus not entitled to DIB or SSI during that time. (R. 162-69).  Plaintiff requested review by the Appeals Council, which granted her request, vacated the ALJ's decision, and remanded the matter to the ALJ for further review on May 20, 2020. (R. 177-78).  On November 2, 2020, ALJ Singh held an additional hearing. (R. 97-127).  By written decision, dated May 17, 2021, ALJ Singh found Plaintiff was not disabled from April 1, 2015 through the decision date. (R. 11-23).  Plaintiff requested review by the Appeals Council, which denied her request on November 12, 2021, (R. 1-4), making the ALJ's decision ripe for this Court's review.

### A.  Medical Evidence Relating to Plaintiff's Physical Impairments[4]

### 1.  Medical Evidence Before the Disability Onset Date

### i.  Montefiore Mount Vernon Hospital

On October 11, 2014, Plaintiff visited the Montefiore Mount Vernon Hospital complaining of a swollen and painful left arm following a fall. (R. 440-41).  Her admitting

---

[3] Refers to the certified administrative record of proceedings relating to Plaintiff's application for social security benefits, filed in this action on June 9, 2022. (Docket No. 12).  All page number citations to the certified administrative record refer to the page number assigned by the Social Security Administration ("SSA").

[4] The administrative record in this case is over 1,000 pages. (*See* Docket No. 12). The Court's summary of the record in this Opinion and Order only includes the evidence relevant to the claims at issue, *i.e.*, evidence related to Plaintiff's left arm, right shoulder and cervical spine impairments.  Moreover, Plaintiff does not challenge the ALJ's determinations regarding her mental impairments, and, therefore, the Court does not summarize the evidence relevant to those impairments.

diagnosis was a displaced comminuted fracture of the shaft of the left humerus; she was discharged on October 12, 2014. (R. 449-51).  On October 14, 2014, Plaintiff underwent an open reduction internal fixation of her left humeral, supracondylar and intercondylar fractures with olecranon osteotomy. (R. 435).  Plaintiff's pre-and-post surgery diagnoses were comminuted left distal humerus supracondylar and intercondylar fractures. (*Id*.).

**ii.  Dr. Jonathan Holder, M.D.**

On October 24, 2014, Plaintiff sought follow-up care from Dr. Jonathan Holder, M.D. (R. 489).  Physical examination of the left elbow revealed mild post-surgical swelling, tenderness over the wrist and decreased sensation over the left small finger. (*Id*.).  An X-ray taken at the office showed the elbow fracture alignment in good position and hardware in place, and no evidence of fracture at the left wrist. (*Id*.).  Plaintiff was advised to continue wearing a splint, given a renewed Tylenol prescription and informed that she would require physical therapy for "a prolonged period of time." (*Id*.).  At a follow-up visit on November 10, 2014, physical examination revealed approximately 60 to 80 degrees of flexion motion and minimal rotational motion. (R. 486).  At that time, Plaintiff was in a sling and Dr. Holder prescribed physical therapy to begin to work on her range of motion. (*Id*.).  Plaintiff returned to Dr. Holder for follow-up care on December 5, 2014. (R. 485).  Plaintiff was "doing well," and was attending physical therapy and taking Tylenol for pain as needed. (*Id*.).  On physical examination, Plaintiff had range of motion of "-10 degrees to 15 degrees of full extension to approximately 80 degrees of flexion" and had decreased sensation over the left small finger ulnar nerve distribution. (*Id*.).  Plaintiff's X-ray revealed "signs of healing," and Dr. Holder renewed her prescriptions for Tylenol and physical therapy. (*Id*.).  During her next follow-up on January 16, 2015, Plaintiff complained of intermittent tightness and discomfort along the anterior aspect of the distal

humerus and stated that she had been going to physical therapy and taking Tylenol No. 3 for pain as needed. (R. 484). Physical examination revealed 10 degrees full extension to 90 degrees flexion on the left, decreased sensation over the left small finger and good capillary refill on the right. (*Id*.). Plaintiff was advised to continue physical therapy and to work on flexion of the left elbow. (*Id*.).

Plaintiff returned to Dr. Holder on March 3, 2015, complaining of tightness and discomfort over the anterior aspect of the elbow with intermittent numbness in the pinky finger. (R. 483). However, Plaintiff stated that she thought she had gotten more range of motion and could do her hair and get dressed more easily. (*Id*.). Upon physical examination, Plaintiff had "-10 degrees of full flexion and about 90 to 95 degrees of flexion" and decreased sensation in the left small finger similar to last visit. (*Id*.). Plaintiff also had full capillary refill and was otherwise neurovascularly intact distally, and no changes were present on her X-ray. (*Id*.). Dr. Holder told Plaintiff to continue physical therapy and to focus on flexion of the elbow. (*Id*.).

## 2. Medical Evidence After the Disability Onset Date

### i. David J. Dickoff, M.D.

On June 3, 2015, Dr. David J. Dickoff, M.D., performed a neurological evaluation and electrodiagnostic study on Plaintiff. (R. 568). Dr. Dickoff noted that Plaintiff began to experience numbness in her fourth and fifth fingers on the left hand, waxing and waning "squeezing, crushing, [sic] pain," "pinprick sensations," and "swollen feelings and tightness" over the medial aspect of the hands after her left arm surgery in November 2014. (*Id*.). Plaintiff's physical examination revealed "[l]eft elbow extension…reduced by about 10 degrees but flexion…reduced about 30 degrees," no palpable tenderness around the incision area, but "some tenderness (hyperpathia) to palpation of the ulnar aspect of the left hand." (*Id*.).

Moreover, Plaintiff had some moderate weakness (4/5) of the intrinsic hand muscles and mild weakness of the ulnar-innervated lumbricals on the left side and of flexion of left fingers four and five, but normal strength wrist movements. (R. 569)  Plaintiff also had reduced pinprick and soft touch in the ulnar distribution with some hyperpathia pinprick, but no allodynia to cotton touch. (*Id*.).  The EMG revealed left ulnar mononeuropathy. (*Id*.).  Dr. Dickoff recommended an MRI of the ulnar nerve around the left elbow and, depending on the MRI results, decompression of the ulnar nerve if appropriate. (*Id*.).  Plaintiff sought follow-up care from Dr. Dickoff on August 6, 2015, (R. 567), and October 27, 2016, (R. 565), regarding her left ulnar mononeuropathy.

Dr. Dickoff conducted another EMG and motor nerve conduction test on Plaintiff's left ulnar nerve on September 20, 2017. (R. 562)  Plaintiff presented with numbness, tingling and shooting pains in her left hand, digits four and five and both feet, especially at night, for the last two years. (*Id*.).  The EMG revealed mildly reduced recruitment of the left first dorsal interosseous and the left abductor digiti minimi, but normal results for all remaining muscles. (R. 563).  The nerve conduction study showed: (1) prolonged distal onset latency in the left ulnar segment motor nerve; (2) decreased conduction velocity from the elbow to wrist; (3) "decreased conduction velocity from (A Elbow-B Elbow)"; (4) reduced amplitude and conduction velocity from digit five to the wrist in the left ulnar orthodromic sensory nerve; (5) moderately prolonged left ulnar F wave response latency; and (6) all remaining nerves and F wave latencies within normal limits. (*Id*.).

### ii.  MRI—Upright Imaging

AN MRI was taken of Plaintiff's cervical spine on May 16, 2018 due to Plaintiff's complaints of neck pain. (R. 572).  The MRI revealed: (1) reversal of normal cervical lordosis;

(2) C4-C5 paracentral disc herniation with cord impingement and right C5 nerve root impingement; (3) C5-C6 central disc herniation cord impingement; (4) C6-C7 shallow central disc herniation; (5) incidental note of a 2.4 centimeter nodule within the right lobe of the thyroid; (6) prominent adenoid nasopharyngeal soft tissue. (*Id*.).

On October 30, 2019, an additional MRI was taken of Plaintiff's cervical spine that revealed: (1) loss of normal cervical lordosis with straightening of the curvature; (2) right paracentral/foraminal disc herniation impinging upon the right ventral margin of the cord and right C5 nerve root within the right lateral recess at C4-C5; (3) central and right paracentral disc herniation impinging upon the cord at C5-C6; (4) central disc herniation contacting the cord at C6-C7; (5) limited range of motion during extension; (6) aggravated stenosis at C4-C5, C5-C6 and C6-C7 levels during flexion; and (7) incidental note of a right thyroid lobe nodule. (R. 610-11).

### iii.  Dr. Jonathan Holder, M.D.

On April 17, 2015, Plaintiff presented to Dr. Holder for a six-month checkup after her surgery. (R. 482).  Plaintiff complained of stiffness and decreased sensation in the left ulnar nerve distribution as well as difficulty flexing her fourth and fifth fingers. (*Id*.).  Physical examination revealed "range of motion from -10 degree forward flexion [to] 90 degrees of flexion" and decreased sensation along the ulnar nerve distribution. (*Id*.).  Plaintiff was instructed to return in one month for further evaluation and to discuss possible left ulnar nerve transposition. (*Id*.).  During Plaintiff's follow-up visit on May 27, 2015, she complained of increased difficulty making a fist, particularly with motor and sensory deficit in the left hand. (R. 481).  An X-ray taken that day revealed healed fracture lines and some calcific material in the anterior joint space, an improved left distal humerus fracture, and left ulnar nerve compression.

(*Id.*).  Plaintiff's physical examination was consistent with limited ulnar nerve function, both sensory and motor wise, and no atrophy. (*Id.*).  Plaintiff had a negative Tinel's sign test in the cubital tunnel and her range of motion was 15 to 90 degrees of flexion at the elbow with full supination and pronation. (*Id.*).  Plaintiff was referred for EMG and nerve conduction studies to assess the severity of the nerve compression, and possible surgical intervention depending on the results. (*Id.*).  On August 10, 2015, Plaintiff returned to Dr. Holder to discuss her EMG and nerve conduction study results, which revealed signs of ulnar nerve compression at the left elbow region. (R. 480).  Plaintiff continued to complain of moderate numbness and tingling in the left ulnar nerve region, with no muscle wasting and occasional grip loss. (*Id.*).  On December 14, 2015, Plaintiff returned to Dr. Holder for a preoperative evaluation for a left elbow ulnar neuropathy and removal of her elbow hardware, which had become painful. (R. 479).  After discussing the benefits and risks, Plaintiff elected to schedule the surgery. (*Id.*).

On January 4, 2016, Dr. Holder removed Plaintiff's elbow hardware and performed a left ulnar neurolysis and anterior transposition. (R. 477).  During a follow-up visit on February 24, 2016, Plaintiff stated that she was improving, but continued to have some tingling into the left ring and small finger. (R. 475).  At that time, Plaintiff had not started physical therapy. (*Id.*).  Plaintiff's physical examination revealed limited extension, to -20 degrees, and full flexion of 100 degrees. (*Id.*).  Further, Plaintiff had a negative Tinel's sign test at the elbow, some minor decreased sensation in the ulnar distribution of the small and ring fingers, good sensation of the ulnar distribution of the hand and forearm, and no weakness on FCU strength. (*Id.*).  The X-ray revealed some anterior calcification of the capsule but otherwise no change. (*Id.*).  Dr. Holder again advised Plaintiff to start physical therapy. (*Id.*).  On June 10, 2016, Plaintiff sought follow-up care from Dr. Holder following the removal of her hardware after her surgery. (R. 474).

Plaintiff's complaints included intermittent stabbing pain and continued numbness along the left forearm extending to the small finger. (*Id*.).  On physical examination, Plaintiff had "approximately -10 degrees full extension," ability to "flex to 100 degrees," normal pronation and supination, no laxity, and sensation intact to light touch over the ulnar nerve distribution. (*Id*.).  Plaintiff was prescribed physical therapy. (*Id*.).

On February 16, 2017, Plaintiff's physical examination demonstrated full range of motion in her left elbow with no tenderness. (R. 549).  Dr. Holder noted that Plaintiff's EMG demonstrated left ulnar neuropathy, which had not improved after surgery, but that Plaintiff's left elbow had full mobility and her pain had improved. (*Id*.).  Dr. Holder encouraged Plaintiff to undergo a follow-up EMG focused on the upper extremity for the purpose of localization of any specific site of compression. (*Id*.).  On June 16, 2017, Plaintiff complained of continued pain along the lateral aspect of her left elbow, which radiated towards her fourth and fifth finger, both at night and with motion. (R. 548).  During physical examination, Plaintiff's elbow was not swollen or palpably tender and she had a good range of motion, but displayed some mild weakness and decreased sensation over the left fourth and fifth finger. (*Id*.).  Plaintiff was advised to continue with the medication prescribed by the neurologist and engage in activities as tolerated. (*Id*.).  Plaintiff's physical examination remained unchanged during her visits on July 28, September 29, and November 3, 2017 and January 12, 2018. (R. 544-47).

During a November 9, 2018 visit to Dr. Holder, Plaintiff complained of left hip pain and a neck strain with radiculopathy. (R. 928).  Dr. Holder's evaluation of the cervical spine showed paraspinal muscle spasm with reduction in flexion and lateral bending; restricted rotation on each side to 20 degrees; and left-sided hand sensory deficit in the C7 distribution. (*Id*.).

### iv.  State Consultative Exam – Dr. Julia Kaci, M.D.

On September 29, 2016, Dr. Julia Kaci, M.D., completed an employability examination of Plaintiff for the Westchester County Department of Social Services. (R. 584).  Plaintiff told Dr. Kaci that she had not felt relief after her surgery and complained of pain and numbness on the left elbow, forearm and hand, locking fingers and difficulty bending her elbow. (*Id.*).  Dr. Kaci noted that Plaintiff's left elbow flexion was limited at 110 degrees and her extension was full, her left upper extremity strength was 4/5, there was numbness over her left forearm and last two fingers, and weakness in her left finger extension. (R. 585).  Dr. Kaci opined that Plaintiff was limited to occasionally lifting or carrying up to 10 pounds and was very limited (1-2 hours) in using her hands, but otherwise did not have limitations. (*Id.*).

On January 6, 2017, Dr. Kaci completed an internal medicine examination at the behest of the New York State Office of Temporary and Disability Assistance, Division of Disability Determinations. (R. 537).  Dr. Kaci noted that Plaintiff's cubital tunnel syndrome surgery had not been successful, and Plaintiff complained of limited range of motion, pressure, and stabbing pain in the left elbow. (*Id.*).  Plaintiff rated her pain a 9/10, and 6/10 with pain medication, and stated it was worse at night. (*Id.*).  Plaintiff also reported constant numbness and tingling over her third, fourth, and fifth fingers on the left side, and reported difficulties holding things with her left hand due to cramping. (*Id.*).  Plaintiff stated that her cooking was limited to microwaving, she did light cleaning and sweeping, and she had difficulty doing laundry or shopping due to problems carrying bags with her left upper extremity. (R. 538).  Plaintiff was able to take care of her children, shower and dress herself, and required help doing her hair due to inability to reach with her left arm. (*Id.*).  On physical exam, Plaintiff cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (R. 539).

Her left elbow had flexion of 90 degrees, full extension, and full range of motion with pronation and supination. (*Id*.).  Plaintiff had decreased sensation to light and sharp touch over the left upper extremity laterally from the elbow down, including the last three fingers on her left hand, and 4/5 strength proximally and distally in the left upper extremity. (*Id*.).  Her right upper extremity had normal sensation and strength. (*Id*.).  She had a full range of motion of her left wrist and shoulder. (*Id*.).  Plaintiff's hand and finger dexterity were intact in both hands and she had 5/5 grip strength bilaterally. (*Id*.).  Dr. Kaci diagnosed Plaintiff with left elbow fracture, status post-open reduction internal fixation, cubital tunnel syndrome, surgical intervention unsuccessful and asthma. (R. 540).  Based on these findings, Dr. Kaci opined that Plaintiff had moderate limitations with lifting, carrying, pushing, pulling, and "reaching behind the lower extremity," and all activities that required prolonged usage of the left hand. (*Id*.).

During a subsequent assessment on March 29, 2017, Dr. Kaci noted that Plaintiff's elbow flexion was 90 degrees and she had full extension, her left forearm, fourth, and fifth fingers had decreased sensation to touch, and her left fourth and fifth fingers had numbness. (R. 596).  Dr. Kaci opined that Plaintiff was very limited (1-2 hours) with pushing, pulling, bending and using her hands, and could only occasionally lift or carry up to 10 pounds. (*Id*.).

**v. Dr. Lawrence Liebman, M.D.**

On January 10, 2017, Plaintiff presented for an interpretation of a radiographic examination of her left distal forearm, including the wrist. (R. 541).  Dr. Liebman found that: (i) the visualized distal portion of the left forearm demonstrated no evidence of acute fracture or destructive bony lesion; (ii) there was an intramedullary rod with screws in the proximal ulna extending distally from the olecranon process; (iii) there were two screws in the interepicondylar

region of the distal humerus; and (iv) there was mild humeroulnar degenerative joint disease

(joint space narrowing and osteophyte formation). (*Id*.).

### vi. White Plains Hospital

On June 6, 2018, Plaintiff visited orthopedic surgeon Dr. Jared Brandoff, M.D.,

complaining of neck pain. (R. 847).  Plaintiff reported that she had first begun to experience neck

and right arm pain, which radiated into her biceps, and right hand tingling that began

approximately three months prior. (R. 848).  Plaintiff also stated that she had left arm pain

stemming from her 2014 accident and cubital tunnel syndrome, which caused tinging in the last

two digits of her left hand. (*Id*.).  Plaintiff's physical examination revealed a reduced painful

cervical spine range of motion, normal strength, normal appearance and no atrophy. (R. 848-49).

An X-ray of the cervical spine showed mild diffuse degenerative disease, questionable 1-2mm

motion of C1 with respect to C2 on flexion and extension, but no gross instability. (R. 849).  Dr.

Brandoff diagnosed Plaintiff with cervical radiculopathy and cervical disc herniation, and did not

note any long tract signs or neurological dysfunction. (R. 848-49).  Plaintiff was advised to

continue physical therapy and anti-inflammatory medication. (R. 849).  Plaintiff returned on July

11, 2018, complaining of worsening neck and left arm pain. (R. 871).  Dr. Brandoff noted that

Plaintiff's physical examination was "essentially normal," but Plaintiff did have some spasming

and restricted range of motion. (*Id*.).  He ordered an EMG. (R. 874).

On July 11, 2018, a bilateral EMG of Plaintiff's upper extremities was taken, which

revealed right upper extremity radiculopathy. (R. 574, 907).  Plaintiff returned to Dr. Brandoff to

discuss the EMG on November 7, 2018, and complained of continued neck and arm pain. (R.

907).  Plaintiff's physical examination remained unchanged from prior visits. (*See* R. 906-07).

After discussing treatment options, including surgery, Plaintiff elected to pursue pain

management. (R. 907).

**vii.  Dr. Munazza Afzal, M.D.**

On November 26, 2018, Plaintiff visited Dr. Munazza Afzal, M.D. for an osteoarthritis

evaluation. (R. 667).  Plaintiff complained of worsening pain stemming from her left arm injury

and reported that she had since developed cervicalgia, sciatica and intermittent pain in her knees.

(*Id*.).  Plaintiff also stated that she had stiffness in her neck, legs and arms in the morning that

lasted for about thirty minutes and improved with activity. (*Id*.).  Plaintiff also stated that she had

been diagnosed with cervical radiculopathy, refused surgery and was referred to pain

management. (*Id*.).  Plaintiff's diagnoses included generalized osteoarthritis, herniated cervical

disc and cubital tunnel syndrome. (R. 668).  Dr. Afzal discussed treatment including diet, weight

loss, epidural injections and pain management medications. (*Id*.).

**viii.  Dr. Nadereh Rafat, M.D., P.C.**

On October 21, 2019, Plaintiff sought follow-up treatment from neurologist Dr. Nadereh

Rafat, M.D., P.C. regarding residual ulnar nerve neuropathy at the elbow. (R. 684).  Plaintiff was

diagnosed with cervical disc disorder, unspecific mononeuropathy of the left upper limb and

radiculopathy in the cervical region. (*Id*.).  Dr. Rafat ordered an MRI of the cervical spine and a

second neurological surgeon opinion, and Plaintiff was advised to avoid lifting, pulling and

pushing. (R. 685).

**ix.  Dr. Syed S. Rahman, M.D.**

On March 20, 2019, Plaintiff visited physical medicine and rehabilitation specialist Dr.

Syed S. Rahman, M.D., complaining of continued neck and back pain. (R. 958).  Plaintiff

reported significant pain down her right upper extremity and left lower extremity, cubital tunnel

syndrome, and discomfort turning her neck and walking. (*Id.*).  Plaintiff's neck exam revealed tenderness in the cervical spine, abnormal extension, flexion, lateral left and right bend, and left and right rotation, but normal strength and sensation. (R. 959).  Plaintiff had negative Spurling and Phalen's tests. (*Id.*).  Dr. Rahman recommended continued physical therapy, medication, and epidural steroid injections in the cervical and lumbar spines. (R. 963).  Plaintiff received the injections on March 28 and April 8, 2019. (R. 975-76, 981-84).  During a follow-up visit on May 22, 2019, Plaintiff reported that the epidural injections helped her neck and back pain "by 60%," but she had more right shoulder and hip pain. (R. 1008).  During physical examination, Plaintiff was experiencing tenderness in the cervical spine and had abnormal extension, flexion, left and right lateral bend and left and right rotation, but normal strength and sensation. (R. 1009).  Dr. Rahman recommended home exercise and continued medications. (R. 1013).  On July 31, 2019, Plaintiff returned to Dr. Rahman with back and neck pain. (R. 1068).  Plaintiff stated that the cervical and lumbar injections had helped her pain. (*Id.*).  Physical examination revealed: (1) tenderness in the lumbar, sacroiliac and thoracic; (2) abnormal range of motion; (3) normal back strength; (4) negative right and left straight leg tests; (5) normal reflexes; and (6) normal sensation. (R. 1069).  Dr. Rahman opined that Plaintiff had positive facet tenderness with extension rotation more along the left than on the right side, limited bending, rotation and extension due to discomfort and positive tender points along the thoracolumbar/lumbosacral paraspinals. (*Id.*).

Plaintiff received an epidural steroid injection in her cervical spine at C4-C6 on September 20, 2019. (R. 1090).  During a follow-up visit on September 27, 2019, Plaintiff reported her neck pain was ">50%" improved after the injection. (R. 1094).  Physical examination showed tenderness in the cervical spine, abnormal range of motion, normal muscle

strength and sensation, normal upper extremities muscles with 5/5 strength bilaterally, positive

tender points along the right trapezius, and negative Spurling and Phalen's tests. (R. 1094-95).

On November 7, 2019, Plaintiff visited Dr. Rahman for continued back and neck pain.

(R. 1136).  Plaintiff told Dr. Rahman that the last cervical epidural injection had not helped, and

that her neck felt stiff, she had left leg pain and numbness in her hands. (*Id.*).  Plaintiff's physical

examination remained unchanged from her September 27, 2019 visit. (*See id.*).  During a June

18, 2020 telemedicine visit, Plaintiff complained of continued back and neck pain. (R. 1174).

Plaintiff's neck had no obvious tenderness, she had normal strength and sensation, her Spurling

and Phalen's tests were negative and she had normal range of motion. (*Id.*).  Dr. Rahman noted

that Plaintiff continued to have "myofascial pain possibly secondary to fibromyalgia," and

prescribed home exercise and medication. (R. 1178-79).

**x.  Anthony Salvo, P.A.**

On July 3, 2019, Plaintiff saw Anthony Salvo, P.A., regarding pain in her shoulders, left

hip pain and right ankle pain. (R. 1036).  Plaintiff stated that her right shoulder was "most

symptomatic," and she had minimal symptoms in the left shoulder. (*Id.*).  Physical examination

showed no tenderness of the AC joint, slightly limited forward flexion and discomfort, more on

the right side, slight impingement, slight discomfort with Hawkins maneuver, slightly limited

internal and external rotation on both sides, 5/5 rotator cuff strength, 4+/5 supraspinatus strength

with mild discomfort, which was more symptomatic on the right, no tenderness of the bicep

tendon, and intact neurovascular status. (R. 1037).  PA Salvo diagnosed Plaintiff with bilateral

shoulder impingement with improvement with physical therapy up until that point. (R. 1038).

Plaintiff was told to continue with physical therapy. (*Id.*).  Plaintiff saw PA Salvo again on

September 11, 2019, complaining of right shoulder pain. (R. 1077).  PA Salvo noted that

Plaintiff had continued right shoulder impingement with bicep tendinitis despite conservative treatment. (R. 1079). Plaintiff was offered a cortisone injection, but declined at that time, and elected to obtain an MRI of the right shoulder to rule out a rotator cuff or bicep tear. (*Id*.).

**xi.  Dr. Richard Weinstein, M.D.**

On June 5, 2019, Plaintiff visited Dr. Richard Weinstein, M.D., complaining of pain in both shoulders and hips. (R. 600). Plaintiff's bilateral shoulder examination showed 150-degree range of motion for forward elevation and 150 degrees for abduction, no instability, a positive impingement sign, 4/5 strength in the rotator cuff, normal strength without any atrophy with the exception of weakness in the rotator cuff and tenderness in the bicep tendon bilaterally. (R. 603). An X-ray taken of the shoulders that day demonstrated type II acromion and no arthritis. (R. 604). Plaintiff was diagnosed with bilateral shoulder impingement and biceps tendinitis and instructed to go to physical therapy and avoid overhead lifting. (*Id*.). On July 31, 2019, Plaintiff had a follow-up appointment with Dr. Weinstein regarding worsening pain in her right shoulder, particularly at night. (R. 1056). Dr. Weinstein diagnosed Plaintiff with impingement and biceps tendinitis and told Plaintiff to start physical therapy on the right shoulder, avoid overhead and heavy lifting as much as possible, and follow-up for a potential MRI and injections if the pain persisted. (*Id*.). On January 22, 2020, Plaintiff visited Dr. Weinstein complaining of left shoulder pain. (R. 1147). Plaintiff stated that her pain was slowly improving, and she had pain lying on the shoulder and reaching up or out, which did not improve with home exercise or medication. (R. 1150-51). Plaintiff's left shoulder physical examination revealed 170 degree forward elevation, 170 degrees of abduction, internal rotation to the T8 spine, external rotation of 60 degrees (normal 60), no pain with motion, 5/5 rotator cuff strength and normal muscle strength without atrophy. (R. 1151). Dr. Weinstein noted that Plaintiff had continued left

shoulder impingement, which was slowly improving with home exercises, stretching and strengthening. (*Id*.).

**B.  Nonmedical Evidence**

**1.  Plaintiff's Function Report**

On November 20, 2016, Plaintiff completed a function report. (R. 353-62).  Plaintiff reported that she lived in an apartment. (R. 353).  Her daily routine included waking up, showering and brushing her teeth, getting her kids ready for school and cooking. (R. 353-54). Plaintiff stated that her mother helped her wash and braid her hair and her brother cut her son's hair. (R. 354).  As a result of her illnesses, Plaintiff stated that she was unable to hold a phone to her ear, drive, do her hair, hold heavy objects, do her daughter's hair, type with both hands, bend her arm, and sweep and mop with both hands. (*Id*.).  Further, Plaintiff stated that she had to use her right hand and arm to do everything on the left side. (R. 355).  While Plaintiff used to cook yams, potato salad and fried chicken, she now prepared daily microwavable meals. (*Id*.). Plaintiff was able to iron and mop with her right hand and do light sweeping, and required help with laundry and deep cleaning. (R. 355-56).  Plaintiff went outside daily to bring her children to the bus, walked, rode in a car, grocery shopped and shopped online for clothing, paid her bills and socialized with friends once every two months. (R. 356-57).  However, Plaintiff was unable to drive because her left hand often got stuck "in a clawlike position," was painful, and she was unable to move it. (R. 356).  While previously Plaintiff enjoyed working out, she was unable to do so due to pain with punching, lifting and bending her arm. (R. 357).  Regarding her abilities, Plaintiff stated that she: (i) could only lift with her right arm and had limited ability to carry things; (ii) had to keep her left arm straight while sitting; (iii) did not reach with her left arm; (iv) had no feeling in her left pinky and ring fingers and, therefore, could not hold things without

dropping them; (v) at times, had blurry vision from her medication and dry eye syndrome; and (vi) could walk for eight minutes before needing to rest one minute due to her asthma. (R. 358-59).  Plaintiff stated that her pain first began and started to interfere with her daily activities in November 2014. (R. 360).  She experienced stabbing pain all day from her forearm radiating to her hand and fingers, which was aggravated by bending her arm. (R. 361).  While she took gabapentin every eight hours since October 2016, it did not provide much relief. (R. 361-62).  She also used a warm compress for pain management. (R. 362).

**2.  Plaintiff's Testimony**

On November 2, 2020, Plaintiff appeared for a telephonic hearing before ALJ Singh. (R. 99).  Plaintiff was represented by Yocasta Duran. (R. 100).  Plaintiff's representative stated that the record was incomplete, pending records from three sources; the ALJ granted the representative's request for a two-week extension to submit those records. (R. 101-02).  Plaintiff's representative did not have any objection to moving the previously-provided exhibits into evidence. (R. 102).

Plaintiff testified that she was 37 years old and had her GED. (R. 103).  She lived in a house with her two children, who she cooked for using the microwave and air fryer 95% of the time due to her impairments. (R. 103).  Her children were 16 and 10 years old. (R. 115).  Her son was disabled, used a wheelchair or walker, and required additional help, including changing his diaper; he received some assistive care from state and school programs. (R. 118-19).  Her daughter helped her with household tasks, including cooking, and was able to shower and dress herself. (R. 118).  Plaintiff also did small loads of laundry every day or every other day and used a Swiffer wet and dry on her floors. (R. 103-04).  She had difficulty completing these household tasks due to issues bending and getting back up from her sciatica, arthritis in her right shoulder

and herniated disc in her neck. (R. 104).  Plaintiff was able to bathe and groom herself using assistive devices. (*Id.*).  Regarding her employment history, Plaintiff stated that she had worked as a nursing assistant, at CVS, in childcare and a real estate agent over the last 15 years. (R. 105). Plaintiff explained that it was "impossible" for her to do those jobs because of her limits with walking, lifting her arms up over her head and lifting objects, neck pain and inability to bend her left arm. (R. 107).  Plaintiff took about 20 medications for her ailments, some of which caused side effects. (R. 107-09).  Plaintiff was able to sit down for about 30 minutes before she experienced pain and needed to lay down due to shooting pain up her leg and straining in her neck. (R. 110).  She also stated that she: (i) could sit and stand for about 30 minutes; (ii) could walk for about one and a half to two blocks before taking a 15 minute break; (iii) could lift about five pounds; (iv) had issues kneeling and bending due to arthritis in her knees; (v) could climb stairs "step by step;" (vi) had difficulty reaching forward; (vii) tried to avoid reaching overhead; (viii) had difficulty using her hands due to weakness from her ulnar nerve in her left arm and arthritis and nerve compression from her neck causing radiating pain in her right hand; and (ix) had issues remembering appointments, following instructions, concentrating and working in close proximity to others. (R. 110-14).  While Plaintiff had a driver's license, she was unable to drive because of right knee pain, and instead took medical transportation. (R. 115).  She wore braces on both knees due to arthritis. (R. 116).  Regarding her right arm, Plaintiff testified that she began to feel pain radiating from her upper back down through her right arm a few years prior, causing tingling and numbness in her hand. (*Id.*).  She went to physical therapy and got injections to manage her pain, and declined surgical treatment. (*Id.*).

**3. Vocational Expert Testimony**

Vocational Expert ("VE") Jane Gerrish ("VE Gerrish") testified at Plaintiff's hearing. (R. 120). VE Gerrish confirmed that she had reviewed the exhibits and familiarized herself with Plaintiff's vocational background prior to the hearing. (R. 121). The VE stated that Plaintiff's past work as a nursing assistant and babysitter would be performed at a medium exertional level, her work as a pharmacy technician and real estate agent would be performed at a light exertional level. (R. 121-22). The ALJ posed a hypothetical to VE Gerrish, asking her to assume an individual with Plaintiff's age, education, and work experience who can perform the full range of light work, as defined in the Dictionary of Occupational Titles ("DOT"), except that Plaintiff had a sit/stand option after 20 to 30 minutes, having to sit down for one to two minutes before standing back up, can never climb ladders, ropes or scaffolds, can occasionally climb ramps, stairs, balance, stoop, kneel, crouch and crawl, can occasionally engage in fine and gross hand manipulation with her left non-dominant hand, and can frequently engage in fine and gross hand manipulation with her right dominant hand. (R. 122-23). Further, the hypothetical individual would avoid concentrated exposure to irritants such as fumes, odors, dust and gases. (R. 123). ALJ Gerrish testified that such an individual would not be able to perform Plaintiff's past work. (*Id*.). Moreover, the VE testified that there would not be other positions available that an individual with those limitations could perform. (*Id*.). However, if the manipulative limitation was modified to frequent fine and gross hand manipulations with the left non-dominant hand and all other limitations remained the same, the VE testified that such an individual would be able to perform the job of linen grader at a light exertional level. (R. 123-24).

The ALJ then asked the VE to assume that an individual could perform the full range of sedentary work, as defined in the DOT, with the same postural and environmental limitations as

the prior hypothetical, with the following added limitations: a sit/stand option after 20 to 30 minutes, having to stand up for one to two minutes and sit back down, limited to frequent fine and gross hand manipulations with the right dominant hand and occasional fine and gross hand manipulations with the left non-dominant hand. (R. 124-25).  The ALJ confirmed that such an individual could not perform Plaintiff's past work, but could perform the following jobs at the sedentary exertional level: telephone solicitor, charge account clerk, and food and beverage order clerk. (R. 125).  The ALJ then asked whether such an individual could perform those positions if she needed to be off task for more than 15% of the work day, to which VE Gerrish replied they could not. (*Id*.).  VE Gerrish confirmed that her testimony was consistent with the DOT and her experience in job placement. (*Id*.).

Plaintiff's representative then asked VE Gerrish to assume that the second hypothetical individual would be limited to occasional reaching in all directions, but never reaching overhead, was limited to routine tasks, and would need to miss two days of work per month. (R. 126).  VE Gerrish testified that such an individual would not be able to perform the jobs of telephone solicitor, charge account clerk, and food and beverage order clerk at the sedentary exertional level. (*Id*.).

**C.  The ALJ's Decision**

ALJ Singh first determined that Plaintiff met the insured status requirements of the Social Security Act ("Act") through December 31, 2022. (R. 14).  Thereafter, ALJ Singh applied the five-step procedure established by the Commissioner for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520(a) and 416.920(a). (R. 14-23).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 1, 2015. (R. 14).  At step two, the ALJ determined that, from April 1, 2015 through the decision date, Plaintiff had the severe

impairments of left humerus fracture, cubital tunnel syndrome, asthma, cervical disc herniations, impingement of the right shoulder, and left leg iliotibial band syndrome/tendinitis. (*Id*.).  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments set forth in 20 C.F.R. Part 404, subpt. P, App. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (R. 15).  ALJ Singh noted that she had specifically closely considered the possible applicability of Listings 1.18 (abnormality of major joint(s) in any extremity), 1.23 (non-healing or complex fracture of upper extremities), 3.03 (asthma) and 11.14 (peripheral neuropathy). (*Id*.).

The ALJ determined that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that she "is limited to work allowing for the ability to work with a sit/stand option with after sitting for 20-30 minutes, would need to stand up for 1-2 minutes and then sit; never climb ladders, ropes, or scaffolds; occasionally climb stairs/ramps, balance, stoop, kneel, crouch, or crawl; limited to frequently performing fine and gross hand manipulation with the right dominant hand and occasionally with the left non-dominant hand; and avoid concentrated exposures to irritants, such as fumes, odors, dusts, and gases." (R. 17).  The ALJ considered all of Plaintiff's symptoms and their consistency with the objective medical evidence and other evidence in arriving at the RFC, based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929 and SSR 16-3p. (*Id*.).  The ALJ also considered the opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927. (*Id*.).  Ultimately, the ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with

the medical evidence and other evidence in the record for the reasons explained in th[e] decision." (R. 20).

The ALJ assigned "some weight" to Dr. Kaci's opinion that Plaintiff had "moderate limitations to lifting, carrying, pushing, pulling, reaching behind with the lower extremity, and all activities that require prolonged use of the left hand." (R. 21). The ALJ assigned this opinion some weight because, while "the overall evidence and findings of the consultative physician support some limitations in lifting, carrying, and use of the left hand…th[e] opinion did not specify how much the claimant could perform these activities…[and] did not mention the claimant's ability to stand or walk." (*Id*.). Additionally, the ALJ assigned "limited weight" to the opinions prepared "for other agencies" because those agencies have "different regulations." (*Id*.). The ALJ gave "limited weight" to statements from Plaintiff's treating sources about avoiding various activities, including lifting, heavy lifting, overhead lifting, pushing, pulling and deep squats because the opinions did not mention to what extent the activities could be done, and it was unclear if such advice was to be avoided on an ongoing basis or just after the visits. (*Id*.).

At step four, the ALJ found that Plaintiff was unable to perform her past relevant work as a nursing assistant, pharmacy technician, real estate agent and babysitter. (*Id*.). At step five, after considering Plaintiff's RFC, and Plaintiff's age, education and work experience, the ALJ concluded that she was not disabled under the Act because she could perform other work that existed in significant numbers in the national economy. (R. 22).

## II. DISCUSSION

Plaintiff argues that the ALJ's decision should be reversed and remanded for further proceedings because: (1) the ALJ erred in finding that Plaintiff's upper extremity complex fracture did not meet the criteria in Listing 1.23; (2) the ALJ erred in finding that Plaintiff's

peripheral neuropathy did not meet the criteria in Listing 11.14; (3) the VE's testimony was inconsistent with the DOT, thus requiring remand for further explanation; and (4) the ALJ erred by failing to perform a function-by-function assessment of Plaintiff's severe impairments. (Pl. Br. at 15-20).[5]  The Commissioner argues that: (1) the ALJ's decision was supported by substantial evidence; (2) the ALJ properly determined that Plaintiff's upper extremity complex fracture did not meet the criteria in Listing 1.23; (3) the ALJ properly determined that Plaintiff's peripheral neuropathy did not meet the criteria in Listing 11.14; (4) the ALJ's RFC determination was supported by substantial evidence; and (5) the ALJ's step five finding was supported by substantial evidence. (Comm'r Br. at 7-24).

## A.  Legal Standards

A claimant is disabled if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam) (quoting 42 U.S.C. § 423(d)(1)(A)).  The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe impairment or combination of
> impairments; (3) whether the impairment meets or equals the severity of the
> specified impairments in the Listing of Impairments; (4) based on a
> "residual functional capacity" assessment, whether the claimant can
> perform any of his or her past relevant work despite the impairment; and (5)
> whether there are significant numbers of jobs in the national economy that
> the claimant can perform given the claimant's residual functional capacity,
> age, education, and work experience.

---

[5] Because Plaintiff's brief does not contain page numbers, page number references to Plaintiff's brief refer to the page numbers generated by the ECF system.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117,

120 (2d Cir. 2008)); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).  The claimant has

the general burden of proving that he or she is statutorily disabled "and bears the burden of

proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*,

537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to show there is

other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443,

445 (2d Cir. 2012) (per curiam).

      When reviewing an appeal from a denial of SSI or disability benefits, the Court's review

is "limited to determining whether the SSA's conclusions were supported by substantial evidence

in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d

Cir. 2013) (per curiam) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also*

42 U.S.C. § 405(g).  Substantial evidence means "relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)

(quoting *Consolidated Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Put

another way, a conclusion must be buttressed by "more than a mere scintilla" of record evidence.

*Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).  The substantial evidence standard is "very

deferential" to the ALJ. *Brault*, 683 F.3d at 448.  The Court does not substitute its judgment for

the agency's "or 'determine *de novo* whether [the claimant] is disabled.'" *Cage v. Comm'r of

Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134

F.3d 496, 501 (2d Cir. 1998)).

      However, where the proper legal standards have not been applied and "might have

affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty

to review the decision of the administrative agency by simply deferring to the factual findings of

the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id*.

## B.  The ALJ's Duty to Develop the Record

Initially, the Court must be satisfied that the record is fully developed before determining whether the Commissioner's decision is supported by substantial evidence. *See Smoker v. Saul*, 19-CV-1539 (AT) (JLC), 2020 WL 2212404, at *9 (S.D.N.Y. May 7, 2020) ("Whether the ALJ has satisfied this duty to develop the record is a threshold question.").  "[I]n light of the 'essentially non-adversarial nature of a benefits proceeding[,]'" "[a]n ALJ, unlike a judge at trial, has an affirmative duty to develop the record." *Vega v. Astrue*, No. 08-CV-1525 (LAP) (GWG), 2010 WL 2365851, at *2 (S.D.N.Y. June 10, 2010) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).  "This duty is present even when a claimant is represented by counsel." *Atkinson v. Barnhart*, 87 F. App'x 766, 768 (2d Cir. 2004) (summary order).  "Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence" is appropriate. *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997).  "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d. Cir. 1996)); *see also Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order).

Here, the Court finds that there are no obvious gaps in the record.  The record consists of voluminous medical records, (R. 572-76, 607-18, 659-64, 688-95); treatment records, (R. 430-535, 542-71, 577-78, 599-606, 619-58, 665-87, 696-840, 846-1182); Plaintiff's function report,

(R. 353-62); medical opinions from consultative examiners, (R. 536-41, 579-98, 841-45); and

Plaintiff's testimony, (R. 103-20).  Moreover, at the hearing, Plaintiff's counsel did not have any

objections to the evidence. (R. 102). *See David B. C. v. Comm'r of Soc. Sec.*, 20-CV-01136

(FJS/TWD), 2021 WL 5769567, at *7 (N.D.N.Y. Dec. 6, 2021) (ALJ fulfilled duty to develop

the record where "Plaintiff did not object to the contents of the record or identify any gaps that

need to be filled").  Accordingly, the Court concludes that the ALJ fulfilled her duty to develop

the record.

## C.  The ALJ's Finding that Plaintiff's Impairments Did Not Meet or Equal a Listed Impairment

Under a theory of presumptive disability, a claimant may be eligible for benefits if he has

an impairment that meets or equals an impairment found in the Listing of Impairments. *See* 20

C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, subpt. P, App. 1.  The listings specify the criteria for

impairments that are considered presumptively disabling. *See* 20 C.F.R. § 404.1525(a).  A

claimant may also demonstrate presumptive disability by showing that his impairment is

accompanied by symptoms that are equal in severity to those described in a specific listing. *See*

20 C.F.R. § 404.1526(a).

When a claimant meets or equals the requirements of a listing, he or she is entitled to an

"irrebuttable presumption of disability." *DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir.

1998).  "For a claimant to show that his impairment matches a listing, it must meet all of the

specified medical criteria.  An impairment that manifests only some of those criteria, no matter

how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990).  "Where the

claimant's symptoms, as described in the medical evidence, appear to match those described in

the Listings, the ALJ must provide an explanation as to why the claimant failed to meet or equal

the Listings.  If the ALJ fails to do so, however, the court may look to other portions of the

ALJ's decision and to clearly credible evidence in finding that his determination was supported

by substantial evidence." *Figueroa v. Comm'r of Soc. Sec.*, No. 19-CV-6472 (MWP), 2020 WL

2393308, at *5 (W.D.N.Y. May 12, 2020) (internal citations omitted).  "It is Plaintiff's burden to

demonstrate that his disability meets all of the specified medical criteria." *Mercado v. Berryhill*,

No. 1:15-cv-00282 (MAT), 2017 WL 6275726, at *3 (W.D.N.Y. Dec. 11, 2017) (internal

citations and quotations omitted).

**1. Listing 1.23**

  Plaintiff argues that the ALJ improperly determined that Plaintiff's left arm fracture

failed to meet Listing 1.23 because "Plaintiff's complex fracture of an upper extremity lasted for

more than 12 months." (Pl. Br. at 16).  The Commissioner counters that the ALJ appropriately

determined that Plaintiff's fracture was not under continuing surgical care for twelve months,

and, in any event, Plaintiff did not present evidence of an inability to initiate, sustain and

complete work-related activities involving fine and gross movements. (Comm'r Br. at 9-10).

  Listing 1.23 requires:

> A. Nonunion or complex fracture of the shaft of the humerus, radius, or
> ulna, under continuing surgical management (see 1.00O1) directed toward
> restoration of functional use of the extremity.
> AND
> B. Medical documentation of an inability to independently initiate, sustain, and
> complete work-related activities involving fine and gross movements (see 1.00E4)
> that has lasted, or is expected to last, for a continuous period of at least 12 months.

20 C.F.R. Part 404, subpt. P, App. 1, § 1.23.  A complex fracture is no longer under "continuing

surgical management" when "the last surgical procedure or medical treatment directed toward

the re-establishment or improvement of function of the involved part has occurred." 20 C.F.R.

Part 404, subpt. P, App. 1, § 1.00O1.  "Fine movements…involve use of [a claimant's] wrists,

hands, and fingers; such movements include picking, pinching, manipulating, and fingering,"

while "[g]ross movements involve use of [the claimant's] shoulders, upper arms, forearms, and hands; such movements include handling, gripping, grasping, holding, turning, and reaching…[and] also include exertional abilities such as lifting, carrying, pushing, and pulling." 20 C.F.R. Part 404, subpt. P, App. 1, § 1.00E4.  "Examples of performing fine and gross movements include, but are not limited to, taking care of personal hygiene, sorting and handling papers or files, and placing files in a file cabinet at or above waist level." *Id*.

Here, it is undisputed that Plaintiff's elbow fracture included multiple fractures, and thus constituted a complex fracture; therefore, Listing 1.23 applies. (*See* Comm'r Br. at 10, n.5).  The ALJ determined that Plaintiff's complex fracture did not meet all listing criteria because "[t]he evidence shows that the claimant had an upper extremity fracture, but it was found to have healed." (R. 16).  Specifically, the ALJ noted that: (i) Plaintiff's left humerus fracture was treated via surgery on October 14, 2014—prior to the April 1, 2015 alleged onset date; (ii) on October 24, 2014, while Plaintiff complained of pain in her elbow and tingling in her left small finger, "[X]-rays showed fracture alignment in good position;" (iii) on January 4, 2016, Plaintiff underwent left elbow hardware removal surgery. (R. 17-18).  Thus, because Plaintiff's hardware was removed in January 2016—nine months after Plaintiff's alleged onset date—the ALJ properly concluded that Plaintiff's left humerus fracture was no longer under continuing surgical management for more than twelve months during the relevant time period. *See Laine v. Comm'r of Soc. Sec.*, No. 07 Civ. 1251 (RO), 2013 WL 2896968, at *22 (S.D.N.Y. June 13, 2013) (complex fracture did not meet listing where "[t]here is no support in the medical records evidencing that Plaintiff's fracture to the radial head of her right elbow failed to heal").

Moreover, the ALJ extensively discussed treatment records demonstrating that Plaintiff's elbow had consistently full range of motion and nearly full flexion of the elbow post-surgery.

(*See* R. 17-18).  The ALJ cited to, *inter alia*: (1) an August 10, 2015 examination where

Plaintiff's elbow had an "excellent range of motion with only some minor flexion loss and no

loss of grip or flexor strength in the hand;" (2) a February 2016 examination in which Plaintiff

had some decreased sensation but was noted to be improving; (3) a September 2016 examination

demonstrating flexion of 110 degrees and full extension range of motion of the elbow, 4/5 upper

extremity strength, and some numbness in her left forearm; (4) a January 2017 consultative

examination demonstrating flexion of 90 degrees and otherwise full range of motion, some

decreased sensation in the left upper extremity from the elbow down, 4/5 left upper extremity

strength proximally and distally, no muscle atrophy and 5/5 bilateral grip strength and intact

hand and finger dexterity; (5) a January 2017 X-ray of the left forearm that revealed no evidence

of acute fracture; (6) a February 2017 examination that revealed improvement in left elbow pain

and full range of motion and no tenderness; (7) a March 2017 examination that revealed 90

degrees of flexion and full range of motion for extension and decreased sensation in the left

forearm and fourth and fifth fingers; (8) a June 2017 examination which showed some mild

weakness of the elbow, "good range of motion," and no swelling or tenderness; and (9) a July

2017 examination that demonstrated no tenderness and weakness of the left elbow, but "good

motion." (R. 18).  The ALJ also considered Plaintiff's reported activities of daily living,

including: (1) Plaintiff's hearing testimony that she experienced tingling and numbness in her

arm and problems reaching forward, but did light cooking and cleaning, small loads of laundry

and could bathe and dress herself and could lift up to five pounds; and (2) Plaintiff's November

2016 function report, in which she stated that she used her right arm to do things on her left side,

made microwavable meals and could only lift with her right arm, and did light cleaning. (R. 20).

Thus, even assuming, *arguendo*, that Plaintiff demonstrated that she had a complex fracture

under continuing surgical care, the ALJ's conclusion that Plaintiff did not have an inability to

"independently initiate, sustain, and complete work-related activities involving fine and gross

movements" was supported by substantial evidence.  Accordingly, the ALJ properly concluded

that Plaintiff's elbow fracture did not meet Listing 1.23.

## 2.  Listing 11.14

Plaintiff argues that remand is warranted for further evaluation of Listing 11.14 because

clinical examinations demonstrate that Plaintiff had limited motor function in her upper

extremities and "various statements from Plaintiff's treating sources" advised Plaintiff to

"avoid[] various activities, such as lifting/heavy lifting/overhead lifting, pushing, pulling, and

deep squats." (Pl. Br. at 17).  The Commissioner contends that the substantial evidence supports

the ALJ's conclusion that Plaintiff did not have an extreme limitation in the ability to use both of

her upper extremities, as required by Listing 11.14. (Comm'r Br. at 15-16).

Listing 11.14, governing peripheral neuropathy, requires:

A. Disorganization of motor function in two extremities (see 11.00D1), resulting in
an extreme limitation (see 11.00D2) in the ability to stand up from a seated position,
balance while standing or walking, or use the upper extremities; *or*
B. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), *and* in
one of the following:
1. Understanding, remembering, or applying information (see 11.00G3b(i)); or
2. Interacting with others (see 11.00G3b(ii)); or
3. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
4. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. Part 404, subpt. P, App. 1, § 11.14 (emphasis added).  "Disorganization of motor

function means interference, due to [the claimant's] neurological disorder, with movement of

two extremities; i.e., the lower extremities, or upper extremities (including fingers, wrists, hands,

arms, and shoulders)."  20 C.F.R. Part 404, subpt. P, App. 1, § 11.00D1.  "Two extremities"

means "both lower extremities, or both upper extremities, or one upper extremity and one lower

extremity." *Id*.  "Extreme limitation means the inability to … use your upper extremities to independently initiate, sustain, and complete work-related activities." 20 C.F.R. Part 404, subpt. P, App. 1, § 11.00D2.  "Inability to use your upper extremities" means "a loss of function of both upper extremities (including fingers, wrists, hands, arms, and shoulders) that very seriously limits your ability to independently initiate, sustain, and complete work-related activities involving fine and gross motor movements," which "include not being able to pinch, manipulate, and use your fingers; or not being able to use your hands, arms, and shoulders to perform gross motor movements, such as handling, gripping, grasping, holding, turning, and reaching; or not being able to engage in exertional movements such a lifting, carrying, pushing, and pulling." 20 C.F.R. Part 404, subpt. P, App. 1, § 11.00D2c.

Here, the ALJ's determination was supported by substantial evidence.  In the decision, the ALJ extensively discussed the evidence regarding Plaintiff's upper extremity impairments, including her left humerus fracture and ulnar nerve compression and right shoulder impingement, and the functional limitations resulting therefrom. (R. 17-21).  First, as discussed above, the ALJ extensively discussed treatment records for Plaintiff's elbow discussing, *inter alia*, feelings of numbness and tingling in her left arm and certain fingers, but largely full range of motion, 90+ degree elbow flexion, 4/5 upper extremity strength, no muscle atrophy, 5/5 bilateral grip strength and intact hand and finger dexterity. (*See supra* Section II.C.1).  The ALJ expressly considered the 2017 EMG of Plaintiff's upper extremity, (*see* Pl. Br. at 17), and noted that it "was markedly improved from the 2015 study," (R. 18), as well as the treatment records cited by Plaintiff, (R. 18 (citing Ex. 3F at 3, R. 475)). The ALJ also extensively discussed the evidence regarding Plaintiff's right shoulder impingement, including: (1) a June 2019 physical examination demonstrating somewhat decreased range of motion of the shoulders, positive

impingement sign, 4/5 rotator cuff strength, bicep tendon tenderness and no atrophy; (2) a July

2019 examination in which Plaintiff was noted to have right shoulder impingement, which had

improved with physical therapy, and normal range of motion for the right shoulder; (3) a

September 2019 MRI which revealed partial tear of the supraspinatus tendon and mild fluid

within the subacromial/subdeltoid bursa (cited in Pl. Br. at 17); (4) a September 2019

examination in which Plaintiff complained of continued discomfort and difficulty lifting, but

noted she had slight improvement with physical therapy; (5) a January 2020 examination in

which Plaintiff reported pain with reaching up or out, which decreased with medication and daily

home exercises; and (6) a June 2020 examination in which Plaintiff reported she had a June 2020

MRI which revealed osteoarthritis, but also stated she had not been in pain management for

many months and the purpose of the visit was to have a form completed for school. (R. 19-20).

Upon review of the record, the Court finds that the ALJ's conclusion that Plaintiff's peripheral

neuropathy did not result in extreme limitations in the ability to use both extremities, as required

by Listing 11.14, was supported by substantial evidence. *See, e.g., Jackson-McWilson v. Astrue*,

No. 11-CV-623S, 2012 WL 3096426, at *3 (W.D.N.Y. July 30, 2012) (ALJ's conclusion that the

plaintiff's bilateral carpal tunnel syndrome did not meet Listing 11.14 supported by substantial

evidence where Plaintiff consistently complained about pain and numbness and diagnostic

testing showed moderately severe median neuropathies at the wrist, but treatment notes indicated

improvements in the wrist, including full range of motion and intact hand and finger dexterity,

and 5/5 bilateral grip strength).

Moreover, the ALJ acknowledged the "various statements from the claimant's treating

sources about various activities," including lifting, heavy lifting and overhead lifting now cited

by Plaintiff, (Pl. Br. at 17), but assigned those opinions limited weight because they did not

"mention to what extent these activities can be done" and it was "unclear if these activities were advised to be avoided on an ongoing basis or just after these visits." (R. 21).  Under the governing regulations, the ALJ weighs medical opinions, which include "what [claimants] can do despite impairment(s)." 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1).  Thus, it was within the ALJ's authority to assign less weight to the opinions that failed to consider what Plaintiff could still do despite her limitations.  Further, the ALJ may assign less weight to opinions that do not provide sufficient support for an opinion, or that are inconsistent with the record as a whole. *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4).  Upon review of the record, the Court does not find that the ALJ erred in assigning limited weight to these opinions where, as discussed herein, the record as a whole does not support a finding that Plaintiff had an ongoing complete inability to lift bilaterally. *See Jackson-McWilson*, 2012 WL 3096426, at *4.  Accordingly, the ALJ's conclusion that Plaintiff's peripheral neuropathy did not meet Listing 11.14 was supported by substantial evidence.

**D.  Plaintiff's RFC Challenge**

Plaintiff argues that the ALJ failed to perform a function-by-function assessment and, specifically, to assess reaching limitations. (Pl. Br. at 18-19).  The Commissioner counters that relevant precedent does not require an explicit function-by-function assessment, and that "the ALJ addressed all relevant limitations in the RFC assessment." (Comm'r Br. at 21).

The RFC is "what a claimant can still do in a work setting, despite physical and/or mental limitations caused by impairments and any related symptoms, such as pain." *Traufler v. Astrue*, No. 7:11-1089, 2012 WL 7753772, at *3 (N.D.N.Y. Nov. 30, 2012), *report and recommendation adopted*, 2013 WL 1092124 (N.D.N.Y. Mar. 15, 2013) (citing 20 C.F.R. §§ 404.1545, 416.945(a)); *see also Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).  "[T]he RFC assessment

must include a discussion of the individual's abilities on that basis." *Melville*, 198 F.3d at 52

(quoting SSR 96-8P, 1996 WL 374184, at *2 (July 2, 1996)) (internal quotations omitted).

"Before an ALJ classifies a claimant's RFC based on exertional levels of work (i.e.,

whether the claimant can perform sedentary, light, medium, heavy, or very heavy work), he [or]

[she] must first identify the individual's functional limitations or restrictions and assess his or her

work-related abilities on a function-by-function basis ...." *Cichocki*, 729 F.3d at 176 (quoting

SSR 96-8P, 1996 WL 374184, at *1) (internal quotations omitted).  Such an assessment should

discuss "physical abilities (e.g., sitting, standing, walking, lifting, carrying, pushing, pulling) and

other manipulative or postural functions (e.g., reaching, handling, stooping, or crouching) that

may reduce a claimant's ability to do past work and other work." *See Lanza v. Berryhill*, No. 19

Civ. 6783 (AT) (RWL), 2020 WL 5606845, at *18 (S.D.N.Y. Aug. 27, 2020), *report and*

*recommendation adopted*, 2020 WL 5603551 (S.D.N.Y. Sept. 18, 2020) (citing 20 C.F.R. §

404.1545(b); SSR 96-8P, 1996 WL 374184, at *5-6).  "Each function must be considered

separately (e.g., the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours), even

if the final RFC assessment will combine activities (e.g., walk/stand, lift/carry, push/pull)." SSR

96-8P, 1996 WL 374184, at *5-6 (internal quotations omitted).  "[T]he RFC assessment must

also include a narrative discussion, describing how the evidence supports the ALJ's conclusions,

citing specific medical facts, and non-medical evidence." *Glessing v. Comm'r of Soc. Sec.*, No.

13 Civ. 1254 (BMC), 2014 WL 1599944, at *9 (E.D.N.Y. Apr. 21, 2014) (quoting *Wichelns v.*

*Comm'r of Soc. Sec.*, No. 5:12–CV–1595 (NAM/ATB), 2014 WL 1311564, at *6 (N.D.N.Y.

Mar. 31, 2014)) (internal quotations omitted).

Although an explicit function-by-function assessment is not always required, "[r]emand

may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant

functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Cichocki*, 729 F.3d at 177.  This is because "a failure to first make a function-by-function assessment of the individual's limitations or restrictions could result in the adjudicator overlooking some of an individual's limitations or restrictions," which "could lead to an incorrect use of an exertional category to ... an erroneous finding that the individual is not disabled." *Id*. at 176 (quoting SSR 96–8P, 1996 WL 374184, at *4) (internal quotations omitted).

Here, while the ALJ did not perform a function-by-function analysis, "failure explicitly to engage in such a function-by-function analysis does not constitute a *per se* error requiring remand." *Cichocki*, 729 F.3d at 173-74.  Indeed, Plaintiff's argument "ignores the entirety of the ALJ's decision, in which [s]he reviews [Plaintiff's] abilities and the medical records to determine [Plaintiff's] RFC." *Cruz v. Astrue*, 941 F. Supp. 2d 483, 499 (S.D.N.Y. 2013).  As an initial matter, the ALJ expressly considered the evidence cited by Plaintiff, (*see* Pl. Br. at 19), including: (1) the "May 2018 MRI of the cervical spine [that] showed C4-7 disc herniations," (R. 19); (2) the September 2019 MRI that "showed partial tearing of the supraspinatus tendon and mild fluid within the subacromial/subdeltoid bursa," (*Id*.); (3) Dr. Kaci's January and March 2017 consultative examinations, (R. 18); and (4) Plaintiff's testimony and reported daily activities, (R. 20).  Moreover, review of the decision as a whole demonstrates that the ALJ "thoroughly discussed [Plaintiff's] functional work-related abilities and explained h[er] reasons for arriving at h[er] assessment of those abilities." *Cruz*, 941 F. Supp. 2d at 498.  This included a discussion of Plaintiff's treatment records, diagnostic imaging and testing, testimony and consultative examination findings regarding her upper extremities and cervical disc impairments. (*See* R. 17-21).  Specifically, the ALJ noted that the "reaching behind with the lower extremity"

limitation in Dr. Kaci's report lacked evidentiary support. (R. 21).  The record as a whole thus demonstrates that the ALJ considered Plaintiff's limitations with respect to her upper extremities. Moreover, the ALJ's conclusion is supported by substantial evidence, including, *inter alia*, multiple treatment notes indicating full or good range of motion of her elbow, 4/5 upper extremity strength, no muscle atrophy, 4/5 rotator cuff strength, normal range of motion for shoulders, and improvements with medication and physical therapy. (*See* R. 17-20; *supra* Section II.C.1).  The ALJ also considered Plaintiff's testimony, in which she stated she did light cooking and cleaning, and laundry in small loads, which are consistent with an ability to reach. (R. 20). *See Cichocki*, 729 F.3d at 178 ("The ALJ also relied on Cichocki's Daily Activities Questionnaire on which she indicated that she performed numerous daily tasks, such as walking her dogs and cleaning her house, that are consistent with a residual capacity to perform light work.").

Accordingly, because the ALJ's decision was "[b]ased on a thorough examination of the evidence of [Plaintiff's] relevant limitations and restrictions," it was supported by substantial evidence, and the lack of function-by-function findings does not constitute a basis for remand. *Id*.; *see also Brown v. Colvin*, 73 F. Supp. 3d 193, 200 (S.D.N.Y. 2014) (remand not required where ALJ did not provide function-by-function analysis "[b]ecause the Commissioner's decision denying [the plaintiff] disability benefits is supported by substantial evidence, and because that decision included a thorough analysis of the evidence of [the plaintiff's] physical and mental limitations"); *Douglas v. Berryhill*, 17-CV-00694 (JMA), 2019 WL 1017341, at *6 (E.D.N.Y. Mar. 4, 2019) ("Remand is unnecessary because the ALJ's RFC analysis affords an adequate basis for judicial review and is supported by substantial evidence.  The ALJ summarized the evidence in the record that reveals the nature and extent of Plaintiff's physical

limitations and work capacity, including medical assessments from examining and non-examining medical experts and Plaintiff's subjective complaints[.]"). *Cf. Murphy v. Barnhart*, No. 00 Civ. 9621 (JSR) (FM), 2003 WL 470572, at *9 (S.D.N.Y. Jan. 21, 2003) (remand appropriate where "the ALJ gave *no indication* that he considered [the plaintiff's] limited ability to manipulate") (emphasis added).

### E. Plaintiff's Step Five Challenge

Plaintiff argues that the ALJ failed to resolve an apparent conflict in the VE's testimony regarding frequent handling and/or fingering and postural limitations (sit-stand option). (Pl. Br. at 17-18). The Commissioner maintains that the VE's testimony was consistent with the DOT. (Comm'r Br. at 23-24).

At step five, the Commissioner has the burden of "show[ing] that there is work in the national economy that the claimant can do" in light of the claimant's RFC. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). In fulfilling this burden, "[a]n ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence ... and accurately reflect the limitations and capabilities of the claimant involved." *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009) (summary order) (citations omitted).

SSA Policy Interpretation Ruling 00-4p ("Ruling") "governs the Commissioner's assessment of whether any particular job can accommodate a given claimant's physical limitations." *Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 91 (2d Cir. 2019). This Ruling states that "[o]ccupational evidence provided by a [VE]…generally should be consistent with" the DOT. SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). If there is an "apparent unresolved conflict" between the VE's testimony and the DOT, the ALJ is tasked with an

"affirmative responsibility" to "elicit a reasonable explanation for the conflict before relying on the VE." *Id.* at *2, *4.  Put simply, this Ruling "mandates" that the ALJ "inquire into all those areas" where the VE's testimony "conflict[s] with the [DOT]." *Lockwood*, 914 F.3d at 92 (quoting *Pearson v. Colvin*, 810 F.3d 204, 209 (4th Cir. 2015)).

During the hearing, the ALJ asked the VE to assume an individual with Plaintiff's age, education and past work experience who could perform the full range of sedentary work, as defined in the DOT, except that she was limited to frequently performing fine and gross hand manipulation in the right dominant hand, and occasionally performing fine and gross hand movements with the left non-dominant hand, never climbing ladders, ropes or scaffolds, occasionally climbing stairs/ramps, balancing, stooping, kneeling, crouching or crawling, avoiding concentrated exposure to irritants, such as fumes, odors, dusts and gases, and the work would need to allow for a sit-stand option, with sitting for 20-30 minutes and standing for 1-2 minutes before resuming sitting. (R. 17, 122-25).  In response to the hypothetical, the VE identified three occupations that exist in significant numbers in the national economy that an individual with those limitations could do: telephone solicitor, charge account clerk and food and beverage order clerk. (R. 125).  These positions are classified as sedentary work and require frequent (exists from 1/3 to 2/3 of the time) handling and/or fingering. *See Telephone Solicitor*, DOT Job Code No. 299.357-014, 1991 WL 672624; *Charge-Account Clerk*, DOT Job Code No. 205.367-014, 1991 WL 671715;[6] *Order Clerk, Food and Beverage*, DOT Job Code No. 209.567-014, 1991 WL 671794.  The ALJ asked the VE if her testimony was consistent with the DOT, and the VE testified that it was consistent with the DOT and with her experience in job placement. (R. 125).

---

[6] Charge-account clerk requires occasional (exists up to 1/3 of the time) fingering. *See* 1991 WL 671715.

Here, the Court finds that there was no apparent conflict with the DOT that required further inquiry by the ALJ.  The Second Circuit addressed a similar argument in *Colvin v. Berryhill*, 734 F. App'x 756, 759 (2d. Cir. 2018) (summary order).  There, the plaintiff, who was "missing the distal tips of three fingers on his left hand," had an RFC whereby he could not "perform any fingering with" the non-dominant left hand. *Id*.  The VE identified three positions (survey worker, parking lot attendant and ticket seller) that "require[d] either frequent handling or constant fingering." *Id*.  The court found that there was no conflict because the DOT listings did "not state that a worker must be able to perform such handling or fingering with both hands, specifically, with a non-dominant hand as well as a dominant hand." *Id*.  The court stated that SSR 96-9p "recognizes that vocational experts 'may be useful' in supplementing the definitions in such circumstances." *Id*.  Because the expert there "testified that [the plaintiff]—who ha[d] no impairment to his dominant right hand—could meet the manipulative requirements of the other jobs identified notwithstanding the limitations to his non-dominant left hand," the ALJ's step five determination was proper. *Id*. at 759-60.

Similarly, the positions here do not expressly state that an individual "must be able to perform such handling or fingering with both hands, specifically, with a non-dominant hand as well as a dominant hand." *Id*. at 759.  According to the DOT, a telephone solicitor "[s]olicits orders for merchandise or services over telephone," calls and quotes prices to potential customers, "[r]ecords names, addresses, purchases, and reactions" of the prospective customers, "[r]efers orders to other workers for filling," "[k]eys data from order card into computer, using keyboard," and "may" develop customer lists and type sales reports. 1991 WL 672624.  A charge account clerk interviews customers applying for accounts, confers with customers about available plans, assists customers in filling out applications, reviews applications sent by mail,

files credit applications with the credit department, and "may" check references, verify entries and correct errors on charge accounts, answer credit rating requests from banks or credit agencies and issue temporary shopping slips. *See* 1991 WL 671715.  A food and beverage order clerk takes food orders over an intercom and records them on a ticket, suggests menu items and answers questions, distributes order tickets to kitchen staff, calls orders, and "may" collect charge vouchers or cash for transactions. *See* 1991 WL 671794.  These descriptions "contain no indicia that they require the full use of both hands" for handling and fingering, and "Plaintiff's speculation that 'both jobs likely require full use of both hands' is insufficient to show that there was an apparent conflict between [the VE's] testimony and the DOT." *Sidney v. Comm'r of Soc. Sec.*, 18-CV-645 (JMA), 2020 WL 7481329, at *5 (E.D.N.Y. Dec. 18, 2020); *see Winder v. Berryhill*, 369 F. Supp. 3d 450, 461-62 (E.D.N.Y. 2019) ("[T]he Court disagrees with the Plaintiff that requiring 'handling' implies ambidexterity, meaning that there is no apparent conflict between the VE testimony and the DOT.").

Moreover, during the hearing, the ALJ made Plaintiff's limitations clear, and the VE testified that such an individual could meet the manipulative requirements of the identified positions. *See Colvin*, 734 F. App'x at 759-60; *see also Franklin v. Saul*, 482 F. Supp. 3d 250, 268 (S.D.N.Y. 2020) ("However, the ALJ made clear to the VE that [Plaintiff] had a significant limitation on the use of his right arm….The VE nonetheless concluded that these jobs could be performed notwithstanding that limitation based on her experience.") (internal citations to record omitted).  The ALJ both: (1) asked the VE, at the outset, to identify if any of her testimony conflicted with the DOT, (R. 121); and (2) at the conclusion, asked the VE if her testimony was consistent with the DOT, to which the VE replied that it was consistent with both the DOT and "with [her] experience in job placement," (R. 125).  Thus, "there was no obvious discrepancy

and… the VE did explain that she was relying on her experience in giving her testimony," which is appropriate under the circumstances. *Franklin*, 482 F. Supp. 3d at 268; *Colvin*, 734 F. App'x at 759-60; *see also Sidney*, 2020 WL 7481329, at *4 (even assuming that asking the VE to identify any conflicts did not sufficiently fulfill the ALJ's duty, "the ALJ had no duty to inquire any further with the VE because there was not even an apparent conflict between the DOT and the VE's testimony"). Accordingly, the Court finds that the VE's testimony did not raise an apparent conflict with the DOT and the ALJ, therefore, was not required to elicit further explanation from the VE. *Colvin*, 734 F. App'x at 759-60; *see also Sidney*, 2020 WL 7481329, at *5; *Franklin*, 482 F. Supp. 3d at 268.

Nor was there an apparent conflict with respect to the sit-stand option that the ALJ failed to resolve. (*See* Pl. Br. at 18; Comm'r Br. at 24). The DOT entries for these positions do not address sit-stand options. Therefore, there is no conflict. *See Gibbons v. Comm'r of Soc. Sec.*, No. 22-2730, 2023 WL 3830774, at *4 (2d Cir. June 6, 2023) (summary order) ("The ALJ did not err… by failing to resolve the alleged conflict between the Dictionary and [the plaintiff's] RFC, which includes the need for a sit/stand option… because these limitations do not conflict with the Dictionary, which the parties agree does not include these limitations."). *See also Paz v. Comm'r of Soc. Sec.*, No. 15cv06353 (AJN) (DF), 2017 WL 1082684, at *37, n.56 (S.D.N.Y. Feb. 1, 2017), *report and recommendation adopted*, 2017 WL 1078573 (S.D.N.Y. Mar. 20, 2017) ("Moreover, other courts have held that, where a vocational expert testifies as to a sit/stand option for a particular occupation, and the DOT is silent as to such an option, the vocational expert's testimony does not, in fact, conflict with the DOT."); *Barone v. Colvin*, No. 15-cv-2051 (KBF), 2016 WL 4126544, at *12 (S.D.N.Y. Aug. 2, 2016) ("There is no actual conflict under SSR 00-4p. Because the DOT does not address the availability of a sit/stand option, the silence

is not contradicted by the vocational expert's testimony which endorsed such an option.")

(collecting cases).  Accordingly, the ALJ did not err in relying on the VE's testimony.

## III.  CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is denied, and

the Commissioner's cross-motion granted.  The Clerk of the Court is respectfully requested to

terminate the pending motions (Docket Nos. 15 and 18), and close the case.

Dated:    September 28, 2023
          White Plains, New York

**SO ORDERED:**

JUDITH C. McCARTHY
United States Magistrate Judge